Filed 10/2/14  P. v. Chiclana CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B248015 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA052518) |
| v. | |
| MARCO CHICLANA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa Mangay Chung, Judge.  Affirmed.

Alan Siraco, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, and Mark E. Weber, Deputy Attorney General, for Plaintiff and Respondent.

————————————

Marco Chiclana appeals his felony convictions for battery inflicting injury on a peace officer, resisting an executive officer, and resisting, obstructing, or delaying a peace officer. He contends there is insufficient evidence to support the convictions because the officer in question was not engaged in lawful performance of his duties. Appellant also maintains that the conviction for battery on a police officer causing injury must be reversed or, alternatively, reduced to a misdemeanor, because he was not the cause of the officer's injuries, and the injuries were not sufficiently serious. Appellant also argues that the trial court erred when it permitted an expert witness to testify regarding use of force. Finally, appellant asks this court to review the trial court's in camera *Pitchess*[1] proceedings for procedural improprieties. We conclude that substantial evidence supports the convictions, the trial court properly exercised its discretion to permit expert testimony, and that the court satisfied its obligations under *Pitchess*. Accordingly, we affirm.

## PROCEDURAL BACKGROUND

By amended information, appellant Mario Chiclana was charged with offenses involving two members of the Los Angeles Sheriff's Department (LASD). As against Deputy Sheriff Jeremy Esswein, appellant was charged with battery inflicting injury on a peace officer (Pen. Code, § 243, subd. (c)(2); count 1),[2] resisting an executive officer (§ 69; count 2), and resisting, obstructing, or delaying a peace officer (§ 148, subd. (a)(1); count 10). As against Sergeant Justin Diez, appellant was charged with attempted mayhem (§§ 203, 664; count 3), assault on a peace officer (§ 245, subd. (c); count 4), resisting an executive officer (§ 69; count 6), and battery inflicting injury on a peace officer (§ 243, subd. (c)(2); count 9). Appellant pleaded not guilty.

A jury trial was held. Over defense objections, the prosecution to introduced expert testimony regarding use-of-force. The jury found appellant guilty as charged on counts 1, 2,

---

[1] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

2

6, 9 and 10.  The jury found appellant guilty of the lesser offense of battery (§ 242) as to count 3.  Count 4, on which the jury was unable to reach a verdict, was dismissed.

Appellant was sentenced to three years' probation and concurrent sentences of 180 days in jail on counts 1 and 9.  The court imposed a jail term of 180 days in jail for misdemeanor resisting arrest (count 10), to be served consecutively to the probation condition.  As to counts 2 and 6, appellant was sentenced to serve three years' probation.  On count 3, the court imposed and stayed a 180-day jail term under section 654.  The court imposed various fees and fines, and awarded appellant presentence custody and conduct credits.

## FACTUAL BACKGROUND

*Prosecution evidence*

On April 2, 2011, appellant's father, Damaso Chiclana[3], had just undergone heart surgery at the Antelope Valley Hospital in Lancaster (hospital).  He insisted on leaving the hospital before being released by his doctor.  After spending most of the day (April 2) at the hospital, appellant received a call from a family friend, Ibarra DeLeon.  DeLeon said Damaso was trying to leave the hospital, and told appellant to return to the hospital.

Appellant drove Damaso's white Nissan Xterra SUV, and parked in front of the hospital where he found Damaso sitting on a bench.  Damaso had surgical drains in his legs, which were bleeding, and he was disoriented.  Appellant tried unsuccessfully to convince his father to go back inside the hospital.  Instead, Damaso decided he would drive himself home, climbed into the Xterra's driver's seat, and tried to start the engine with one of several screwdrivers in the cab.

Appellant and his father got into a heated argument while Damaso was inside the Xterra, yelling and screaming at one another in Spanish.  Appellant's long-time friend, Louis Bozzo, who witnessed the exchange, testified that appellant was the angriest Bozzo had ever

---

[3] Appellant and his father share a surname.  For the sake of clarity we will refer to appellant's father by his first name.

seen him. Appellant tried to take the screwdriver from his father. As they struggled for control of the tools, Damaso scratched appellant's face with a screwdriver. The scratch was small and looked like one that might result from a fingernail scratch. Either Bozzo or appellant took the screwdrivers away from Damaso.

Appellant's wife called 911 for help after hospital security refused to intervene. She was "hysterical" while speaking with the dispatcher. Appellant's wife told the dispatcher several times that her husband had just been "stabbed in the face with a screwdriver" by his father, whom she described as "5150." When asked to describe the assailant, appellant's wife said Damaso was Hispanic. She did not respond to the dispatcher's request for a description of what Damaso was wearing. Dispatch put out a call of a possible assault with a deadly weapon at the hospital by an adult male Hispanic. Meanwhile, appellant had "given up" trying to reason with Damaso.

On the early evening of April 2, 2011, Deputy Esswein was alone on patrol in Lancaster.[4] He wore his full uniform and drove a black and white patrol car with lights on the roof and LASD insignias. Deputy Esswein was armed with a handgun, a baton, O.C. (pepper) spray, and a flashlight. He weighed about 225 pounds. The patrol car was equipped with a "MDT" (mobile digital transmitter), a small black box installed near the car's floor, by the center of the front seat, that displayed dispatched messages from a specific station. The MDT's display screen was roughly two by four inches; approximately six to eight lines of text could be seen at one time. To view the MDT screen, Deputy Esswein had to take his eyes off the road and look toward the floor in the middle of the car. Deputy

---

[4] Deputy Esswein had been with the LASD since May 2007. Prior to becoming a deputy, he successfully completed 64 hours of use of force training at the academy. After joining the LASD, Deputy Esswein worked in the jail for about two-and-one-half years, before being assigned to patrol duty in Lancaster. As of April 2011, he had about one-and-one-half years experience as a patrol deputy. Deputy Esswein was trained to investigate and provide public safety in a situation like the one he encountered at the hospital.

Esswein also wore a transmitter on his lapel through which he received radio broadcasts from the LASD dispatch.

At 5:01 p.m., Deputy Esswein, who was about a mile away, received a radio broadcast that a "245"—assault with a deadly weapon—had just occurred at the hospital. He sped toward the hospital with his lights and siren on. A moment later, dispatch broadcast updated information saying a male Hispanic adult had stabbed the caller's husband in the face with a screwdriver. At 5:02 p.m., Deputy Esswein also received an MDT message stating that a male Hispanic adult had stabbed the informant's husband in the face with a screwdriver. MDT and radio transmissions sent at 5:03 p.m. reported that the suspect was standing in front of the hospital.

At 5:04 p.m., an updated MDT message said the suspect was inside a white Nissan Xterra. This transmission came through at the same moment Deputy Esswein pushed the button on the MDT indicating he had arrived on scene, was getting out of the patrol car and would no longer be able to see the MDT. Deputy Esswein saw text on the MDT referring to a Nissan Xterra, but did not see the information regarding the suspect being inside the SUV.[5] Neither the MDT messages nor the radio dispatches provided the name or physical description of anyone involved in the stabbing at the hospital, or their clothing. Deputy Esswein knew only that the suspect was an adult Hispanic man, who had "stabbed" the 911 caller's "husband" "in the face with a screwdriver." Having not seen the portion of the MDT transmission saying the suspect was inside the SUV, Deputy Esswein believed that person was "standing in front of the hospital." Because the purported victim had been stabbed in the face with a screwdriver, Deputy Esswein expected to encounter a violent situation involving "a lot of blood, a big gash, something along those lines." He expected that, if someone had been "running around stabbing someone in the face," it was likely someone else could also have been hurt, and that there would be at least one victim needing medical attention.

---

[5] There had been no radio dispatch about the suspect being inside the Xterra.

Deputy Esswein was the first officer to arrive. When he arrived, he saw a white Xterra parked in front of the hospital. An older man (Damaso), was sitting in the driver's seat of the cab, with the door open. Two people (whom Deputy Esswein later learned were appellant's mother and DeLeon) stood near the driver's door talking to the man inside. A group of 10 to 15 people was gathered at the rear of the SUV, behind which was parked a pick-up truck. Deputy Esswein did not know who the people were or whether they had anything to do with the 911 call. DeLeon was Hispanic, but Deputy Esswein did not consider him a suspect. Deputy Esswein approached the driver's door and asked Damaso what had happened. Damaso responded in Spanish, but Deputy Esswein could not understand what he said.

As Deputy Esswein was speaking to Damaso, appellant approached Deputy Esswein "very aggressively . . . in a direct path" from the rear of the SUV. Appellant weighed between 280 and 300 pounds. He was wearing dark, loose fitting, sweatpants and a hooded sweatshirt, and (as Deputy Esswein believed at the time) had his hands in the pockets of his pants.[6] Deputy Esswein did not know who appellant was, and appellant did not speak as he approached Deputy Esswein. Deputy Esswein described appellant's facial expressions at that point variously as, "mad," "angry," "hostile, agitated" and "tense," and said he carried himself as if he was "very agitated" and "very annoyed" at what was happening. Deputy Esswein was concerned that appellant might be the suspected assailant. Appellant's dark, baggy clothing made it difficult to see if was concealing a weapon. Appellant had a scratch on one cheek. The scratch was red, but not actively bleeding. It looked like broken skin, or a surface wound one might receive if scratched by the fingernail of someone trying to push you away. It did not look like a bloody gash, or gaping stab wound. Deputy Esswein was "nervous" and "scared."

---

[6] Surveillance video of the incident shown at trial shows that appellant's hands were outside his pockets.

Deputy Esswein took a step back, assumed a defensive position and asked appellant about the scratch on his face.  Appellant said his father had stabbed him with a screwdriver.  At that point, Deputy Esswein did not know Damaso's identity.  To Deputy Esswein, appellant's hostile behavior was at odds with the minimal nature of the scratch on his face and his aggressive approach.  Deputy Esswein, who had past experience with suspects who falsely claimed to be victims, remained uncertain of appellant's role in the incident at the hospital, and needed to continue his investigation and locate the screwdriver.

Deputy Esswein told appellant to take his hands out of his pockets, asked if he had a weapon in his pocket or any outstanding warrants.  Appellant took out his left hand and thrust the palm at Deputy Esswein, saying, "don't even start with me."  As he continued to approach, appellant "bladed" his body, turning to the side.  His left side was closer to Deputy Esswein, and his right side was obscured.  Deputy Esswein did not see then that appellant had taken his right hand from his pocket.[7]  Deputy Esswein testified that appellant's stomach (appellant was obese) and the position of his body as he "bladed," may have obscured Deputy Esswein's ability to see the right side of appellant's body.  In Deputy Esswein's experience, crime victims are usually cooperative, compliant and anxious to tell their story.  Appellant, by contrast, was "extremely resistive."  Deputy Esswein perceived appellant's words and manner as an "immediate threat."  He thought appellant might be the suspect and could have a screwdriver in his pocket.  Deputy Esswein tried to grab appellant's left wrist, to bend it behind appellant's back.  His intent was to ensure that appellant did not have a weapon, and to detain him while he investigated the stabbing.  Deputy Esswein testified that, initially, he had not intended to handcuff or arrest appellant, and would not have employed force against him had he done as instructed.  As Deputy Esswein attempted to grab appellant's left wrist, he pushed him against the SUV to gain leverage.  He told appellant to

---

[7] Deputy Esswein acknowledged at trial that surveillance video showed appellant had removed his hand from his right pocket.  Deputy Esswein did not recall seeing the hand outside the pocket.

take his hands out and put them behind his back. Instead, appellant wrested his left arm from the deputy's grasp, saying, "Fuck you. Get your fucking hands off me." Deputy Esswein testified that appellant then pulled a yellow screwdriver from his right rear pants pocket and tried to hand it to someone nearby. At that point, afraid a fight was about to ensue, Deputy Esswein radioed for the "patch," to alert other deputies to the emergent nature of the situation, and continued trying to get appellant's hands behind his back.

Appellant refused to comply. Instead, he pushed back, tried to turn around rather than facing the vehicle as instructed, twisted out of Deputy Esswein's grasp and moved toward the rear of the SUV. Several other people were close enough to touch Deputy Esswein. Deputy Esswein grabbed appellant's left wrist again, told him to take his hands out and put them behind his back, and to stop fighting. Someone yelled at Deputy Esswein to take his hands off appellant, and someone told appellant to stop fighting. Appellant's wife, Bozzo and DeLeon were all yelling at Deputy Esswein, though he did not hear what they were saying. The situation was tense and compounded by loud noise from a helicopter by then circling above.

When Deputy Esswein saw appellant pull the screwdriver from his right pocket he tried unsuccessfully to knock it out of appellant's hand. Appellant either dropped the tool on the ground or passed it to another person. Deputy Esswein "felt trapped." He was stuck between the SUV and truck, people surrounded and were cursing at him. He was afraid whoever appellant had passed the screwdriver to might assault him. He tried taking appellant to the ground to gain control. Appellant escaped Deputy Esswein's grasp and turned to face him, with his right hand balled into a fist. Deputy Esswein punched appellant in the face. Appellant, in turn, hit Deputy Esswein twice in the head with his fists. The two men traded more blows.

Sergeant Diez arrived as appellant and Deputy Esswein were punching one another; Deputy Esswein was clearly losing the fight. Sergeant Diez wore his LASD uniform and drove a black and white LASD Tahoe. He yelled at appellant to stop fighting and tried unsuccessfully to place him in a Carotid restraint. After jumping on appellant's back,

8

Sergeant Diez was able to pull him to the ground, as appellant and Deputy Esswein continued punching one another, and Deputy Esswein kneed appellant in the ribs. Appellant poked a finger into one of Sergeant Diez's eyes and said, "Get off me." Even after he was on the ground, appellant continued to fight and resist, and tried to get up.

Other deputies arrived to help. One deputy (Holm) used his flashlight to hit appellant on the right arm and in the rib cage or abdomen area two or three times. Another (Epstein) punched appellant in the rib cage or abdomen area as many as six times. A third (Foster) kneed appellant in the head, while a fourth (Carter) pressed his baton against appellant's calves to prevent him from kicking the other deputies. Throughout all this, appellant continued to hit and resist the deputies. He yelled and cursed, refusing to comply with their commands to stop fighting and to put his hands behind his back. Appellant never assumed a defensive position (e.g., curling up in a ball), nor did he ask the deputies to stop hitting him. Instead, he continued engaging in offensive action against the deputies. Finally, Deputy Foster announced he was going to tase appellant, and did so.

After appellant was tased, he said something to the effect of, "I'm done," stopped resisting and laid on the ground allowing the deputies to put his hands behind his back. No further force was used on appellant. After being handcuffed, appellant apologized to the deputies, saying, "I'm sorry. I'm stuck on stupid. I respect you guys." Appellant told the deputies he was "suffering from a case of stupid," and asked whether anyone was hurt. Later, inside the hospital, appellant told Sergeant Diez (in Deputy Carter's presence) that he was sorry, should not have punched the police officer, and that his "mind [was] stuck on stupid."

As a result of the altercation with appellant, Deputy Esswein suffered a swollen wrist, hand, and knuckles, and experienced pain in his wrist that prevented him from moving it. His right arm was scratched, he had marks around his elbow. His face and left knee were swollen, and he had pain in his cheekbones where appellant punched him. Deputy Esswein received medical treatment for his injuries at the hospital. An X-ray taken of his wrist revealed no broken bones. Deputy Esswein did not receive any follow-up treatment for his injuries. Sergeant Diez suffered several small lacerations near one eye, in which he also got

9

appellant's blood after appellant jabbed his finger into it. A preliminary HIV test was negative, but Sergeant Diez underwent follow-up tests for six months to ensure there was no infection.

After the scuffle, one screwdriver was found on the rear bumper of the Xterra, and another on the ground nearby. A third tool, like a socket wrench, (also described at trial as a screwdriver), was recovered from appellant's left rear pants pocket after his arrest. The incident involving appellant and the deputies lasted about 90 seconds, and was recorded by a hospital surveillance camera.

In July 2012, at the conclusion of an internal affairs investigation by the LASD, which included review of the surveillance video, LASD's internal affairs bureau concluded that Deputy Esswein had sufficient time and should have seen that appellant's right hand was out of his pocket and not holding a weapon prior to using force. Deputy Esswein received a three-day suspension, held in abeyance until he completed two courses on tactics and wrote an essay.

*Defense evidence*

*Mario Sandoval*

On the evening of April 2, 2011, appellant's friend, Mario Sandoval, was working in the emergency room at the hospital and saw appellant lying on a gurney. Sandoval went in and out of appellant's room several times that night. He never heard appellant apologize or take responsibility for bringing on the altercation. Sandoval saw two or three deputies use cell phones to photograph appellant. They were smiling and laughing outside appellant's room. Sandoval did not know what they were said or were laughing about. At least one deputy, whom Sandoval did not think had been involved in the scuffle with appellant, made a motion as if to punch someone. Sandoval did not report this behavior to anyone. Neither Deputy Esswein nor Sergeant Diez, who were being treated for cuts and bruises in the emergency room, participated in the laughing or punching motions, or take any photos.

10

*Courtney Overton*

On April 2, 2011, Courtney Overton was a security guard at the hospital. He saw appellant and Damaso argue outside the hospital, saw blood coming down appellant's cheek and told the family to call the LASD. Appellant had two screwdrivers in one hand. Overton saw Deputy Esswein arrive and speak with Damaso inside the Xterra. Deputy Esswein walked toward appellant, whose hands were out and who held the screwdrivers in one hand. Appellant handed the tools to Deputy Esswein, and the two men shook hands. That was "when everything else happened." Appellant was uncooperative, resisted Deputy Esswein's attempt to gain control of him and tried to pull away. Deputy Esswein grabbed appellant's hands to put them behind his back. As he did so, the crowd shouted at Deputy Esswein, with different people saying different things.

Deputy Esswein did not tell appellant to take his hands out of his pockets; appellant's hands were already out. The deputy pushed appellant against the SUV, and appellant pushed back off the vehicle. Deputy Esswein punched appellant in the face. Overton did not see appellant clench his fists before Deputy Esswein swung at him. The two men wrestled with one another. Overton did not see appellant throw a punch at Deputy Esswein or any deputy. One deputy swung a flashlight at appellant, one kicked him and another kneed appellant. One deputy—Overton did not know if it was Deputy Esswein—smiled while punching appellant repeatedly. Appellant remained uncooperative until he was tased. Overton heard someone say, "you need to stop," as the deputies tried to gain control of appellant's hands. A deputy tased appellant. Overton believed he saw at least seven deputies use force against appellant. After appellant had been handcuffed, Overton saw deputies walking around the emergency room with arrogant, "puffed up" demeanors, as if they were proud they had won a fight. Overton acknowledged it was possible the deputies were proud no deputy was seriously injured. He did not see a deputy take photos of appellant.

*Steven Krinsky*

On April 25, 2012, Sergeant Diez and other deputies appeared at the Lancaster home of Steven Krinsky to conduct a parole compliance search for a Mr. Taylor. Krinsky refused

them entry without a warrant. After Sergeant Diez explained no warrant was necessary, Krinsky let two deputies into his home, where they remained for a couple of minutes before emerging without Taylor or anyone else. In late April and in July 2012, Krinsky registered complaints against Sergeant Diez with the LASD. In May 2012, Krinsky bought the internet domain "justindiez.com" and created a webpage discussing how Sergeant Diez had violated his rights, and sent emails to Sergeant Diez. During cross-examination, an April 25, 2012 audio recording was played in which Krinsky said, "You know, I no longer want to give you permission." Krinsky was cross-examined about emails he sent to and a Facebook posting he made about Sergeant Diez, and a statement on his justindiez.com website regarding his willingness to testify about Sergeant Diez.[8] Krinsky did not witness the incident at the hospital on April 2, 2011.

*Nikkia Wise*

On the evening of January 11, 2012, Deputies Esswein and Foster pulled up in a patrol car as Wise sat on her bike. Without saying anything, Deputy Esswein pulled Wise off the bike, put her hands behind her back and put her on the hood of the patrol car. Both deputies held Wise's hands behind her back. Deputy Esswein told Wise to get her hands higher. Wise told the deputies she had asthma and could not breathe. They asked Wise if she had any warrants; she had none and had never been arrested or in trouble. Deputy Foster put Wise in a headlock that made her choke. Wise tried to escape the headlock because she could not breathe. Both deputies tackled and handcuffed her. She hit the car, and suffered pain. When Wise said she could not breathe, one deputy responded that she was fine if she could talk. They lifted Wise up and dragged her to the curb, where they held her down by pushing on her shoulders, causing her hoodie to choke her. Wise screamed. When two female deputies arrived Wise said she was screaming because she could not breathe. Deputies Esswein and Foster eased up on the pressure, allowing Wise to breathe, and the

---

[8] During the prosecution case, Sergeant Diez testified about the search of Krinsky's trailer and his subsequent experiences with Krinsky, including his effort to obtain a restraining order against him.

female deputies searched her. Up to that point, neither Deputy Esswein nor Deputy Foster told Wise why she had been stopped. While being searched, Wise was told she had been riding her bike at night without a light. Wise was released and given a ticket for not having a light on her bicycle or a valid identification. Wise carried a bus pass with her name and photo, which the female deputies found during the search; Deputies Esswein and Foster did not ask her about it. At the time of trial, Wise was suing the LASD, Deputies Esswein and Foster. She was represented by the same attorney representing appellant in a civil suit against the LASD. Wise does not know appellant and was not a witness to the incident at issue here.

On cross-examination, Wise testified that Foster had treated her worse than Deputy Esswein. Deputy Esswein let Deputy Foster put her in a headlock, but also told Deputy Foster to knock it off. Wise did not remember telling a female deputy that Deputy Esswein "really didn't do anything." Her primary complaint against Deputy Esswein was that he had pulled her off her bike for no reason, and did nothing when Deputy Foster mistreated her. Wise has an unspecified mental disability. From August 2011 to April 2012, Wise worked at Desert Haven, which employs disabled individuals who work in the community. She did cleaning work and folded towels before being terminated. Wise was afraid to work because she thought police officers were following and harassing her. Wise believed the police were still following her. The day before she testified, Wise awoke at 4:30 a.m. to see 10 officers looking at her house from inside their patrol cars.

Several friends who had known appellant at least 10 years, and two neighbors, testified as character witnesses. They knew appellant to be a nonviolent person.

*Prosecution rebuttal*

On January 11, 2012, Sergeant Andrea Bradley, then Deputies Esswein and Foster's supervisor, arrived at the location where they had stopped Wise. Wise was sitting on the curb, handcuffed, yelling, "I am going to sue some cops. I can't breathe. They are choking me." Wise did not seem to be having any trouble breathing. Each deputy rested a hand on Wise's shoulders, but neither appeared to exert any pressure on her shoulders. Their hands

were not close to her neck, and nothing appeared to be obstructing her throat. Wise declined medical assistance. Sergeant Bradley took Wise to a patrol car where Wise cried, but did not seem to be in pain. After her release, Wise took her bike and rode or walked away.

On January 11, 2012, Wise spoke with a Lieutenant at the Lancaster station about her experience. She said Deputy Esswein had not really done anything. The Lieutenant saw no bruising on Wise.

## DISCUSSION

1.   *The record contains substantial evidence to support appellant's convictions on counts 2, 10 and 1.*

Appellant contends the evidence is insufficient to support his convictions on counts 2 and 10 for violating sections 69 and 148, respectively. He also argues that his felony conviction for violation of section 243 (count 1) must be reduced to a misdemeanor battery.

a.   *Standard of review and controlling law*

When determining the sufficiency of the evidence to support a guilty verdict, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [99 S.Ct. 2781, 61 L.Ed.2d 560].) "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) "'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]' [Citation.] We "'"presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" [Citation.]' [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 943.)

Section 69 prohibits knowingly resisting, by force or violence, a peace officer in the performance of his duty. (CALCRIM No. 2652.) Section 148, subdivision (a) prohibits the willful resistance, delay, or obstruction of a peace officer discharging or attempting to

14

discharge his duty. (CALCRIM No. 2656.) A felony battery occurs if a person willfully and unlawfully uses force or violence against a peace officer engaged in the performance of his duties, when the person knows or reasonably should know the victim is a peace officer engaged in the performance of his duties, and the officer is injured. (§§ 242, 243, subd. (c); CALCRIM No. 945.) Each crime requires proof the officer was acting lawfully at the time the defendant resisted the officer. (See *In re Manuel G.* (1997) 16 Cal.4th 805, 815.)

Traditional Fourth Amendment analysis divides police interactions into three basic categories—consensual encounters, detention and arrest. Each category involves a separate analysis regarding the degree of restraint and extent to which a person is detained. (*People v. Verin* (1990) 220 Cal.App.3d 551, 555, 557.) Unlike a consensual encounter or arrest, a lawful police detention must be "strictly limited in time duration, scope and purpose." (*Id.* at p. 555.) The agreed upon issue here is whether Deputy Esswein's detention of appellant was lawful.

A detention of a person is a seizure within the meaning of the Fourth Amendment. (*People v. Souza* (1994) 9 Cal.4th 224, 229 (*Souza*).) A detention is lawful if the detaining officer can point "to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*Id.* at p. at p. 231; *United States v. Arvizu* (2002) 534 U.S. 266, 273 [122 S.Ct. 744, 151 L.Ed.2d 740].) The circumstances known or apparent to the officer must include specific facts which, viewed objectively, would cause a reasonable officer to suspect both that crime-related activity has occurred, is occurring or is about to occur, and that the person to be detained is or was involved. (*People v. Conway* (1994) 25 Cal.App.4th 385, 388 (*Conway*).) The officer must have a "reasonable suspicion" the person to be detained has violated the law. (*People v. Dolly* (2007) 40 Cal.4th 458, 463) "'Reasonable suspicion is a lesser standard than probable cause, and can arise from less reliable information than required for probable cause . . . . [Citation.]" (*Ibid.*) "The corollary to this rule is that an investigative detention predicated on circumstances which, viewed objectively, support no more than mere curiosity, rumor or a hunch is unlawful,"

15

regardless of whether the officer acted in good faith. (*Conway*, at p. 389.) Reasonable suspicion is measured by an objective standard, not a particular officer's subjective state of mind at the time of the detention. (*Id*. at p. 388.) "Disputed facts relating to the question whether the officer was acting lawfully are for the jury to determine when such an offense is charged." (*People v. Jenkins* (2000) 22 Cal.4th 900, 1020.) A defendant's subjective understanding that the officer's conduct was lawful is not a required element of the prosecution's proof. (*Id*. at p. 1021.) "The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' *Terry v. Ohio* [1968] 392 U.S. 1, 19 [88 S.Ct. 1868, 1878]." (*Pennsylvania v. Mimms* (1977) 434 U.S. 106, 108–109 [98 S.Ct. 330, 332, 54 L.Ed.2d 331, 335].)

The concept of reasonable suspicion cannot be reduced to a fixed set of rules; it must be determined by looking at "'the totality of the circumstances—the whole picture.' [Citation.]" (*United States v. Sokolow* (1989) 490 U.S. 1, 8 [109 S.Ct. 1581, 1585, 104 L.Ed.2d 1, 10].) This standard requires that a detention have only a "minimal level of objective justification" (*Illinois v. Wardlow* (2000) 528 U.S. 119, 123 [120 S.Ct. 673, 675, 145 L.Ed.2d 570, 576]), and may be initiated by an officer "based not on certainty, but on the need to 'check out' a reasonable suspicion." (*United States v. Clark* (D.C.Cir. 1994) 24 F.3d 299, 303, citing *Adams v. Williams* (1972) 407 U.S. 143, 145–146.) The officer's conduct is judged in light of common sense and ordinary human experience, with deference accorded to the officer's ability to distinguish between innocent and suspicious conduct. "[W]hen circumstances are "'consistent with criminal activity," they permit—even demand—an investigation . . . .' [Citation.] A different result is not warranted merely because circumstances known to an officer may also be "'consistent with lawful activity.'" [Citation.] . . . 'The possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct. Indeed, the principal function of [police] investigation is to resolve that very ambiguity . . . .'" (*Souza*, *supra*, 9 Cal.4th at p. 233.)

### b. Application

The sole issue is whether Deputy Esswein's initial detention of appellant was legally justified. As we shall explain, we conclude it was.

As the nature of Deputy Esswein's reasonable suspicions are circumstances relevant to our inquiry, we turn first to consider what a reasonable officer in his position would have suspected upon arriving at the hospital. That suspicion would have been based on a synthesis of information from three sources: the MDT and dispatch communications, and the deputy's observations at the scene. Here, MDT and radio transmissions received before arrival, Deputy Esswein knew that an adult male Hispanic had purportedly stabbed the caller's husband in the face with a screwdriver, and that the suspect was standing in front of the hospital. At 5:04 p.m., as Deputy Esswein pushed the button indicating his arrival at the scene and exit from the patrol car, he saw part of a 5:04 p.m. MDT message referring to a Nissan Xterra. He did not notice another portion of that message stating the suspected assailant was inside the Xterra.

As he pulled up, Deputy Esswein observed a group of people milling around a white Xterra. An elderly man sat alone inside the SUV. He was disoriented, had drains in his legs and responded to Deputy Esswein's inquiry about what was happening by saying something incomprehensible in Spanish. Deputy Esswein did not see that the man held a screwdriver, nor did he see such a tool nearby. Nothing about Damaso's demeanor or conduct gave Deputy Esswein reason to believe he was the assailant. At that point, there was a lone deputy, significantly outnumbered by a crowd of people, who needed to investigate an urgent report that one unknown Hispanic man had stabbed another with a screwdriver, and no weapon was in sight.

Just then, appellant, who matched the vague description of the suspected assailant, came from behind the Xterra. Appellant, who appeared angry and hostile, and who outweighed Deputy Esswein by up to 75 pounds, moved forcefully toward the deputy. His clothes were baggy and prevented Deputy Esswein from seeing if he had a weapon. Appellant had an open cut on his cheek. The wound was red, and looked like a fingernail

17

scratch, the sort of defensive mark one might receive from someone trying to fend off an attacker. Appellant said his father had stabbed him with a screwdriver. Deputy Esswein did not know who appellant's father was, and the abrasion did not look like the bloody gash the deputy would expect from a stab wound. Deputy Esswein had experienced situations in which a suspect falsely claimed to be a victim. The deputy proceeded with his investigation.

Concerned by appellant's confrontational behavior, Deputy Esswein asked him to remove his hands—obscured from view by the size and position of appellant's body— from his pockets, and whether he had any weapons or outstanding warrants. At that time Deputy Esswein did not intend to handcuff or arrest appellant, only to ensure he had no weapons and to detain him on the curb while Deputy Esswein investigated the assault. Rather than responding in the cooperative manner typical of a crime victim, appellant became "extremely resistive." At that point, Deputy Esswein suspected appellant was the assailant and posed an immediate threat to his and public safety. This suspicion gave rise to an urgent need to ensure that appellant had no weapons. Deputy Esswein attempted to do so and to get appellant's hands behind his back. In response, appellant's level of resistance escalated, and he angrily cursed at the deputy and twisted out of his grasp.

On these facts we conclude that Deputy Esswein had a particularized and objective basis to suspect that appellant was involved in criminal activity. During the course of a detention, an officer may pat search a suspect for weapons if he "could 'point to specific and articulable facts which, taken together with rational inferences from those facts,' would warrant the intrusion. [Citation.]" (*Souza*, *supra*, 9 Cal.4th at p. 229.) Deputy Esswein justified the attempted search by the dangerous nature of the 911 call, appellant's angry demeanor and aggressive approach, his superior size and weight, baggy clothes, body position and refusal to comply.

Appellant counters that, even viewed in totality, these facts do not support an objectively reasonable particularized suspicion that he was engaged in criminal conduct or that he posed a threat to Deputy Esswein's safety. Appellant argues that key facts upon

18

which Deputy Esswein relied were objectively erroneous, while others were merely the product of his subjective nervousness and impression of appellant's demeanor.

Deputy Esswein initially approached the incident and investigation relying on inaccurate information that the assailant with the screwdriver was on the sidewalk outside the SUV.  Relying on *People v. Willis* (2002) 28 Cal.4th 22, appellant insists it was objectively unreasonable for Deputy Esswein to persist in this mistaken understanding.  In *Willis*, the issue was whether an officer's good faith belief in the constitutionality of a search pursuant to a warrant was objectively reasonable.  The court held that an officer's conduct is unlawful where the officer relies on false information from another member of a law enforcement agency, and that reliance is objectively unreasonable because of facts the officer knows or should have known.  (*Id*. at pp. 30–32.)  First, appellant maintains it was objectively unreasonable for the dispatcher to mistakenly report that the assailant was outside on the curb because appellant's wife reported that Damaso was inside the SUV.  Second, it was objectively unreasonable for Deputy Esswein to continue to rely on that erroneous information—by failing to read the full MDT transmission—after it was updated.  Third, the dispatcher should have broadcast the updated information by radio as well as by MDT.  Regardless of whether the primary fault lies with the Deputy Esswein or with the dispatcher, appellant contends the deputy lacked an objectively reasonable basis to detain appellant.  (See *id*. at p. 45 [it was immaterial that erroneous information on which officer relied was relayed by an agency clerk, as the clerk is an "integral part[] of the law enforcement team"].)

Appellant also argues that, once at the scene, Deputy Esswein failed accurately to perceive that both of appellant's hands were outside his pockets and one was extended as he approached.  Thus, Deputy Esswein proceeded to limit appellant's freedom based on an unreasonably mistaken belief that appellant might have a weapon in hand inside a pocket, when available evidence (as depicted at trial in the surveillance video and still photos made from each frame thereof) demonstrated otherwise.

To accept these assertions would be akin to evaluating the integrity of a rope by separating its strands, then testing each individual strand for its tensile strength.  This we will

19

not do. Viewed in totality, the record contains substantial evidence from which the jury could reasonably have found that Deputy Esswein's decision to detain appellant was lawful. As the prosecutor noted at trial, even if Deputy Esswein had seen the full MDT transmission about the suspect being inside the SUV, he could not be certain the suspect had remained there after the dispatcher relayed that information. More importantly, as between the two Hispanic men in question, one elderly, disoriented, and apparently unarmed who sat inside the Xterra, and the other, with his hostile manner and aggressive approach, the deputy had a legitimate, objectively reasonable concern that the latter was the suspected assailant. Accordingly, once Deputy Esswein left the patrol car to confront this scene, nothing about his failure to have read the entire final MDT message would render his conduct unlawful. Nor did the fact that dispatch first mistakenly reported the suspect was standing outside. Deputy Esswein testified that his belief that the suspect was outside was just one factor that concerned him. The pivotal factors were appellant's appearance, hostile demeanor, aggressive actions and refusal to cooperate.

With regard to his conceded failure to see appellant's right hand, Deputy Esswein testified that, although he later learned from the video that appellant's right hand was not inside his pocket, he was unable to see that at the time because of appellant's girth and body position. Deputy Esswein did not decide to detain appellant merely because of an erroneous belief that his hand was in his pocket. Within seconds of the time Deputy Esswein arrived and spoke to Damaso, appellant aggressively approached drawing the deputy's attention to himself, and claimed the cut on his face was a stab wound. Based on his professional experience, the minimal nature of the scratch, and appellant's level of hostility, it was reasonable for Deputy Esswein not simply to accept at face value appellant's claim to be the stabbing victim. (*United States v. Arvizu*, *supra*, 534 U.S. at p. 273 ["'totality of the circumstances'" analysis "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them"].)

20

Deputy Esswein acted in rapid response to appellant's conduct and an uncertain, potentially dangerous situation, out of reasonable concern for his own and others' safety. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." (*Graham v. Connor* (1989) 490 U.S. 386, 396–397 [109 S. Ct. 1865, 1872].) There is minimal room for error when a police officer responds to a call involving an assault with a deadly weapon, and receives a confrontational reception. Even a careful officer remains subject to attack. The "'judiciary should not lightly second-guess a police officer's decision to perform a pat down search for officer safety. The lives and safety of police officers weigh heavily in the balance of competing Fourth Amendment considerations. [Citations.]' The Fourth Amendment has never been interpreted to "'require that police officers take unnecessary risks in the performance of their duties." [Citation.]'" (*People v. Collier* (2008) 166 Cal.App.4th 1374, 1378; *In re Richard G.* (2009) 173 Cal.App.4th 1252, 1255.)

*People v. Mendoza* (2011) 52 Cal.4th 1056 (*Mendoza*) is instructive. In *Mendoza*, the California Supreme Court held that a defendant's hostile reaction to what began as a consensual police encounter, considered together with the facts that it was the middle of the night in an isolated area, and the officer was alone and outnumbered by three people, two of whom wore baggy clothing loose enough to conceal weapons, justified the officer's reasonable apprehension of danger, and his decision to detain defendant to check for weapons. (*Id*. at p. 1082.)

Here, as in *Mendoza*, *supra*, 52 Cal.4th 1056, there was substantial evidence from which a jury could reasonably find that Deputy Esswein acted lawfully to detain appellant to check for weapons, and to isolate him and investigate his role in the incident at the hospital. Deputy Esswein arrived alone to investigate a reported assault with a deadly weapon, and was significantly outnumbered by a large group containing appellant, and his friends and family. Almost immediately (the entire encounter lasted only about 90 seconds), he was confronted by appellant—a much larger man than he—who behaved in an angry, hostile,

21

uncooperative manner. Both appellant's conduct and his appearance were inconsistent with his claimed status as the victim of a stabbing. The evidence shows the decision to detain appellant at this point was part of the lone deputy's need quickly to locate a weapon and otherwise secure the scene in a developing situation. The detention was reasonable to ensure the officer's and others' safety, and to enable him to conduct an investigation. (*Id*. at p. 1082; see also *People v. Avila* (1997) 58 Cal.App.4th 1069, 1072–1074 [officer had reasonable belief his safety was in danger where the defendant acted suspiciously, walked around his car, dropped an envelope, and had a metal object within reach].) On this record, we are satisfied that Deputy Esswein's decision to detain appellant was lawful, and the convictions as to counts 2 and 10 stand. For the same reasons, we also reject appellant's assertion that, because Deputy Esswein was not engaged in the lawful performance of his duties, the felony battery conviction (count 1) should be reduced to a misdemeanor.

2.      *Substantial evidence supports appellant's felony conviction for battery on a police officer causing injury*

Appellant also argues that the felony conviction for battery on a police officer causing injury (count 1), must be reversed because there is insufficient evidence that he caused Deputy Esswein's injuries or that the injuries required medical treatment.

a.      *Appellant as cause of injury*

The court instructed the jurors that to prove appellant guilty of the crime of battery against a peace officer resulting in injury, the prosecution was required to prove that: (1) Deputy Esswein was a peace officer performing the duties of a deputy sheriff, (2) appellant willfully and unlawfully touched Deputy Esswein in a harmful or offensive manner, (3) at a time when appellant knew or should have known that Deputy Esswein was a peace officer performing his duties, (4) Deputy Esswein suffered injury as a result of that touching, and (5) appellant did not act in self-defense. (See CALCRIM No. 945.) The jury was further instructed that harmful "touching can be done indirectly by causing an object or someone else to touch the other person." The latter instruction reflects the principle that "cause" has a particular definition in criminal law. (See CALCRIM No. 240 [An act or

22

omission causes an injury if the injury is the direct, natural and probable consequence of the act or omission, and would not have happened without the act or omission].)

Section 243, subdivision (c) imposes liability where "an injury is inflicted." It does not require that the injury be willfully or personally inflicted by the defendant. An injury may have one or more causes. An act or omission causes an injury if it was a substantial factor in causing the injury, i.e., something more than a trivial or remote factor. (*People v. Caldwell* (1984) 36 Cal.3d 210, 220.)

Though Deputy Esswein did not know precisely how he sustained his injuries, there can be no question that his injuries (swelling and lacerations on his hands, wrists and knees, and facial pain and bruising) resulted from the altercation set in motion by and involving appellant's resistant conduct. It is sufficient that appellant willfully and unlawfully touched Deputy Esswein, who suffered an injury as proximate result of that battery.

b.      *Victim need not receive medical treatment*

Appellant also contends the conviction as to count 1 must be reduced to a misdemeanor because there is no substantial evidence Deputy Esswein's injuries required medical attention.

As a result of the scuffle involving appellant, Deputy Esswein suffered swelling in his face, knee, wrist, hand and knuckles. He suffered pain in his cheekbones from being punched by appellant, and was unable to move his wrist. The jury viewed photographs of Deputy Esswein's injuries. After the altercation, Deputy Esswein spent several hours in the emergency room, where he was treated for cuts and bruises. An X-ray was taken of his wrist; it revealed no broken bones.

"Penal Code section 243, subdivision (f)(6), defines injury as follows: '"Injury" means any physical injury which requires professional medical treatment.' There is no requirement in the statute the victim of the battery actually receive medical treatment. The language in subdivision (f)(6) merely defines the degree of the injury. As was noted in *People v. Longoria* (1995) 34 Cal.App.4th 12: 'It is the nature, extent and seriousness of the injury—not the inclination or disinclination of the victim to seek medical treatment—which

23

is determinative.' (*Id*. at p. 17.) The inquiry is whether there is 'substantial evidence from which a rational trier of fact could have found [the officer's] injuries required professional medical treatment.' (*Id*. at p. 18.)" (*In re Michael P*. (1996) 50 Cal.App.4th 1525, 1528-1529, fn. omitted.) "The test is objective and factual." (*Longoria,* at p. 17.) The standard of review for this claim is the same as discussed in section 1, above.

In *People v. Longoria*, *supra*, 34 Cal.App.4th 12, the officer sustained an injury under section 243, subdivision (c)(1) after being kicked in the groin, sustaining cuts to his fingers and the side of his hand, and his hand was crushed. Although an X-ray taken of the crushed hand revealed no broken bones, the officer was unable to hold his firearm and had to be placed on restrictive duty for several days. (*Id*. at pp. 15–16, 18.) The court found that a "rational trier of fact could have found that [the officer's] injuries required professional medical treatment." (*Id*. at p. 18.) A similar result was reached in *People v. Lara* (1994) 30 Cal.App.4th 658, 667–668, in which an officer was bruised on both knees, sustained cuts and abrasions on his hands, and was "exposed to defendant's blood." Emergency room medical personnel cleaned his wounds, examined him, treated contusions on his knees, and "gave him supplies for scrubbing himself later." (*Ibid*.) The court found this evidence sufficient to support a finding of injury within the meaning of section 243, subdivision (f)(6). (*Lara,* at pp. 667–668.)

In contrast with these cases, the court in *In re Michael P*., *supra*, 50 Cal.App.4th 1525, on which appellant relies, held that a peace officer had not sustained an injury under section 243, subdivision (c), after being kicked by the defendant in the chin and chest. (*Michael P*., at pp. 1528–1530.) At trial, the officer testified that his chest and chin were sore from being kicked. He did not report the soreness to any medical personnel, no one wrote up an injury report or took photographs of his chest and chin, and there was no bruising. (*Id*. at p. 1528.) The court reasoned that soreness alone was not an injury requiring medical treatment. The battery statute in question measures culpability by the severity of an inflicted injury. Thus, the officer's failure adequately to describe his injuries constituted a failure of evidence requiring reversal of the trial court's finding of battery with injury on a peace

24

officer.  (*Id.* at pp. 1529–1530.)  Without injury the offense is a misdemeanor.  (§ 243, subd. (b).)

Here, Deputy Esswein sought and received medical treatment.  He testified that he suffered swelling, lacerations, pain and bruising.  Because the significant swelling, pain and inability to move his wrist, emergency room medical staff deemed it necessary to X-ray Deputy Esswein's wrist to see if it was broken.  *In re Michael P.*, *supra*, 50 Cal.App.4th 1525 is factually distinguishable from the instant case, and does not assist appellant.

3.      *Expert testimony*

Appellant asserts that the judgment must be reversed because the trial court erred in permitting expert testimony as to use of force.

         a.       *Factual background*

Over appellant's objection, LASD Deputy Mark Caron testified as an expert witness regarding use of force.  Deputy Caron had been a deputy for over 22 years and, for the 11 years immediately preceding trial, was assigned to work in field operations, or "force training."  Before that assignment, Deputy Caron spent five years on patrol, three of which were as a field training officer.  He has had hundreds, if not thousands, of encounters with people in the field.  To become a use of force trainer, Deputy Caron had to complete three weeks of LASD training in a 120-hour state-approved course, and to attend a two-week instructor's course through the Los Angeles Police Department.  In 2011, Deputy Caron attended the LASD academy instructors' certification course.  Deputy Caron's unit was responsible for training new deputies at the academy on all aspects of use of force, arrest and control.  The LASD requires patrol deputies to attend an eight-hour refresher course on use of force every two years, which is taught twice weekly by Deputy Caron and his unit.  Deputy Caron also taught a three-week training course for instructors in his unit.  Training for all California peace officers is governed by the Peace Officers' Standards and Training (POST), mandating a specific number of hours for use of force training.  The LASD's training satisfied POST requirements.

25

At the academy, deputies are taught state and federal law regarding appropriate and acceptable conduct, and arrest and control techniques (i.e., how to stand, make a fist, put on handcuffs and defend themselves). Deputies participate in three scenarios with an instructor which require the deputy to recognize and identify a threat, and choose and employ the most appropriate force option. Typically, the scenarios involve one situation requiring little or no force, and two involving violent confrontations. Debriefing sessions follow each enactment. Deputies must also achieve a score of at least 88 on a mandatory written use of force test. Deputy Esswein could not have moved to patrol if he had not successfully completed the use of force courses and passed the written exam.

During training, deputies are taught they may encounter any of four categories of "cooperative," "resistive," "assaultive," or "life threatening" behavior. The deputy's immediate perception determines the category into which a person's behavior belongs, and the correspondingly appropriate degree of force. No use of force need be employed in the first category of "cooperative" behavior, in which the individual complies with the deputy's request or order. A deputy has the authority to search and, in the event of safety concerns (e.g., the deputy believes the person may have a weapon), to handcuff. An individual will not necessarily be arrested simply because he or she is handcuffed. A deputy may handcuff someone as a precautionary measure until the deputy ensures the person poses no threat.

"Resistive" behavior occurs when a person physically or verbally opposes or defies a deputy's direct command. A deputy has several options to deal with a resistive person. Using a firm grip, the deputy may position the person in such a way that, assuming no further resistance, the deputy need use no additional force. If the person resists and the deputy must overcome that resistance, the latter action would be considered use of force. A "control hold" is a common option employed in such situations, in which the deputy grabs the person's arm and manipulates it into a wrist lock or arm control hold. An alternative option would be to spray pepper spray near (but not aimed directly at) the person. A third option is referred to as an "intermediate weapons control technique," in which the deputy's baton is

26

used to assist in an arm control or arm lock. It may take more than one deputy to control a resistive person.

In the third category of "assaultive" or "high risk" behavior, a deputy perceives a very real threat or high possibility of violence to himself or someone else, because the individual is actually engaged in an assault on the deputy or someone else, or the circumstances cause the deputy to believe that risk exists. One example of behavior which would fall into this category would be an encounter with a person who is clenching his fists, has tight jaw muscles, is shifting his stance from neutral to blading his body, and putting his weight on the balls of his feet. Although this individual has not yet assaulted anyone, circumstances cause the deputy to believe an assault may be imminent.

The final category involves behavior by an individual which may be life threatening or cause serious bodily injury to the deputy or someone else. Serious injury includes such things as broken bones, concussions with loss of consciousness, skull fractures and bites. For this category, deputies are authorized to use "personal" weapons, such as punching, elbowing, kneeing or kicking the person. A deputy may use an "impact" weapon, such as a baton or a flashlight, and a Carotid restraint is an authorized tactic at this level, as is the use of canines. "Less lethal munitions" may also be used. Those include firing a pepper spray ball at the person's torso, tasing, or firing a bean bag or rubber bullet at the person. The tactic of "pain compliance" is used. That term means hitting a person so he or she will comply with the deputy's orders and the incident can be ended as quickly as possible, denying a suspect an opportunity to escalate the dangerous behavior. If a person is engaging in behavior that is at the life threatening or serious injury level, deputies are trained that they may use a firearm or impact weapon aimed at the person's vital areas, including the head and spine.

Deputies are trained to hope for the best but to prepare for the worst. In other words, a deputy will approach a situation hoping the person will cooperate, while at the same time remaining mentally and physically prepared to respond appropriately in the event the person engages in resistive or assaultive conduct. Deputies are trained to be sure that if they put

27

their hands on a person, they are legally entitled to do so. They are also trained to think that where "there is one weapon, there is another," so that they must always conduct a thorough search even after a weapon is recovered. Deputies are also trained that if a fight is necessary, they must win. When a deputy is struck, death is a possibility. They are trained not to retreat once engaged in a fight, as there are inherent dangers to relinquishing any level of control over the person. The aim is not just to hold a person down until the person tires. The longer a use of force lasts, the greater the risk of injury to the person and the deputy or deputies. So deputies are trained to gain safe control by getting the person handcuffed as quickly as possible.

In a situation in which a deputy encounters a group of people, does not know who among them is the suspect, and someone in the group does something to make the deputy feel uneasy or threatened, deputies are trained to react as if that person is the suspect and to control him or her and find out what is happening. They are trained to observe and consider peoples' hands, facial expressions, body language, degree of eye contact, movements and what they say, and to err on the side of caution. Deputy Caron opined that, if a deputy believed someone posed a risk to him, the best practice would be to handcuff the person, sort things out and, in the event the person posed no risk, remove the handcuffs.

Responding to hypothetical questions premised on the facts of this incident, Deputy Caron opined that detention of a person in this situation would be appropriate, and that the deputies involved used appropriate levels of force under LASD guidelines. It would be appropriate for a deputy to punch a person if the deputy believed the person was engaging in assaultive conduct. It would be inappropriate for a deputy to hit a person with a flashlight, tase, kick, knee or punch the person if he or she was not engaging in assaultive or the life threatening behavior.

The court instructed the jury to "consider evidence of the officer's training and experience" in deciding whether appellant was lawfully detained. The jury was instructed on the law about detention, arrest and use of force. The court directed the jury to determine whether the force used was objectively reasonable. Jurors were told they need not accept

28

Deputy Caron's expert opinion as true or correct, that they were free to disregard expert testimony they found unbelievable, unreasonable or unsupported by the evidence, and not to allow bias or sympathy to influence their decision.

### b. Legal standard

Expert opinion is admissible if it concerns a matter sufficiently beyond common experience and will assist the trier of fact. (Evid. Code, § 801, subd. (a).) Evidence Code section 801, subdivision (a) "does not flatly limit expert opinion testimony to subjects 'beyond common experience'; rather, it limits such testimony to such subjects '*sufficiently* beyond common experience *that the opinion of an expert would assist the trier of fact*' . . . . The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard. Instead, the statute declares that even if the jury has some knowledge of the matter, expert opinion may be admitted wherever it would 'assist' the jury." (*People v. McDonald* (1984) 37 Cal.3d 351, 367, overruled on another ground by *People v. Mendoza* (2000) 23 Cal.4th 896, 913; see *People v. Stoll* (1989) 49 Cal.3d 1136, 1153–1154.)

Applying this standard, California courts have held that a police officer may testify as an expert on techniques used to control arrestees (*People v. Singleton* (2010) 182 Cal.App.4th 1, 21), and have considered opinion testimony from experts on the issue of reasonableness of force used by police in performing their duties (*Lopez v. City of Los Angeles* (2011) 196 Cal.App.4th 675, 692; *Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 529–530; *Munoz v. City of Union City* (2004) 120 Cal.App.4th 1077, 1090–1093, disapproved on another ground by *Hayes v. County of San Diego* (2013) 57 Cal.4th 622.) The decision whether to admit expert testimony is generally within a trial court's discretion; such rulings are reviewed for abuse of discretion. (*People v. Manibusan* (2013) 58 Cal.4th 40, 98.) Appellant argues Caron's testimony was irrelevant because, ultimately, it was the jury's responsibility to determine whether Deputy Esswein's conduct (i.e., his use of force) was objectively reasonable. The latter point is not in dispute. Nevertheless, "'[t]here is no

hard and fast rule that the expert cannot be asked a question that coincides with the ultimate issue in the case.' [Citations.]" (*People v. Valdez* (1997) 58 Cal.App.4th 494, 507.)

Appellant also argues that Caron's testimony and attendant opinion that Deputy Esswein's conduct was consistent with LASD policy was irrelevant because it was premised on hypothetical facts refuted by the record. The trial court overruled appellant's objections to the prosecutor's hypotheticals. Those hypotheticals tracked Deputy Esswein's testimony and were consistent with the surveillance video. As discussed above, the fact that the dispatcher sent an MDT transmission saying the assailant was inside the SUV would not require Deputy Esswein to assume either that the suspect remained inside the vehicle until he arrived, or that anyone he encountered in the vehicle would be the only possible assailant. Further, although the video shows appellant's right hand was outside his pocket, Deputy Esswein testified that he was unable to see that at the time due to appellant's size and the position of his body. Under the circumstances, the hypotheticals posed to Caron by the prosecution were proper. A hypothetical posed to an expert """"may assume facts within the limits of the evidence, not unfairly assembled, upon which the opinion of the expert is required, and considerable latitude must be allowed in the choice of facts as to the basis upon which to frame a hypothetical question."""" (*People v. Vang* (2011) 52 Cal.4th 1038, 1046.) Moreover, defense counsel posed a set of hypotheticals based on appellant's view of the facts to Deputy Caron, who offered his opinion thereon as well.

Finally, appellant maintains that Deputy Caron's testimony should have been excluded because it was more prejudicial than probative (because it focused the jury on the irrelevant question of whether Deputy Esswein complied with LASD policy, not whether the degree of force employed was lawful), and deprived him of due process. As reflected above, the trial court instructed the jury regarding lawful detention, arrest and the use of force. The court's instructions—to which appellant did not object—do not mention LASD policies. Further, the jury was instructed to evaluate conflicting evidence, that it was free to accept or reject Deputy Caron's expert opinion, and that it should not let bias or sympathy influence its

30

decision. We presume jurors understood and followed the court's instructions.[9] (*People v. Pearson* (2013) 56 Cal.4th 393, 414.) In sum, we conclude that Deputy Caron's testimony was properly admitted, not unduly prejudicial and its admission did not deprive appellant of a fair trial.[10]

4. *The trial court fulfilled its responsibilities under Pitchess*

Before trial, appellant filed four motions under *Pitchess*. As relevant here, appellant sought complaints lodged against Deputy Esswein, Sergeant Diez and eight other deputies for dishonesty and/or excessive use of force. The court found good cause to conduct in camera hearings as to Sergeant Diez, Deputy Esswein and seven other deputies. After its in camera review, the court ordered disclosure of certain discoverable information.

Appellant has asked this court to independently review for procedural error the sealed transcripts of in camera proceedings conducted on September 15 and 15, 2011, and July 16 and August 15, 2012, to determine whether the court failed to make a proper record of the materials it reviewed and ordered disclosed. (Cf. *People v. Gaines* (2009) 46 Cal.4th 172, 180–181; *People v. White* (2011) 191 Cal.App.4th, 1333, 1341–1342.) Respondent does not object.

---

[9] The record reflects the jury, which sent out several notes during deliberation, knew it was free to seek clarification or guidance from the court if necessary.

Further, to the extent appellant failed specifically to object to Deputy Caron's testimony regarding dangers faced by deputies, he forfeited that argument on appeal. (See *People v. Lindberg* (2008) 45 Cal.4th 1, 48; Evid. Code, § 353, subd. (a) [in the absence of a timely and specific objection, a judgment may not be reversed based on erroneous admission of evidence].)

[10] Our conclusion that Deputy Caron's testimony was properly admitted and not unduly prejudicial defeats appellant's argument that he was deprived of due process. (See *Estelle v. McGuire* (1991) 502 U.S. 62, 70 [112 S.Ct. 475, 481, 116 L.Ed.2d 385, 398] [admission of relevant evidence does not violate due process unless the evidence is so prejudicial as to render the trial fundamentally unfair]; *People v. Falsetta* (1999) 21 Cal.4th 903, 913 [same]; accord, *People v. Jones* (2013) 57 Cal.4th 899, 949.)

The California Supreme Court in its decision in *People v. Mooc* (2001) 26 Cal.4th 1216, 1228 authorized appellate courts to review in camera *Pitchess* proceedings for error. During the in camera hearing, the "trial court should then make a record of what documents it examined before ruling on the *Pitchess* motion. Such a record will permit future appellate review. If the documents produced by the custodian are not voluminous, the court can photocopy them and place them in a confidential file. Alternatively, the court can prepare a list of the documents it considered, or simply state for the record what documents it examined." (*Mooc*, at p. 1229.) The standard for review is an abuse of discretion. (*Id*. at p. 1228; *People v. Samayoa* (1997) 15 Cal.4th 795, 827 [trial courts have wide discretion when ruling on motions to discover police officers' personnel records].)

We have independently reviewed the sealed reporter's transcripts for the specified in camera hearings, and the trial court's decision regarding the discoverability of material in the deputies' personnel files. The transcripts constitute an adequate record of the documents provided to and reviewed by the court in those hearings. Based on our review of the court's findings, we conclude the court fulfilled its responsibilities and properly exercised its discretion with regard to discovery denied. (*People v. Mooc*, *supra*, 26 Cal.4th at pp. 1228–1229.) The trial court conducted a diligent and thorough review of pertinent documents in the deputies' personnel files before concluding that only certain evidence was properly discoverable evidence. There was no error.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED.


                                         JOHNSON, J.


We concur:


        CHANEY, Acting P. J.


        MILLER, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.